UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| SCOTT J. HEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:16-cv-00229-RLY-MPB |
| | ) | |
| NANCY A. BERRYHILL Acting Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON**
**APPROPRIATE DISPOSITION OF THE ACTION**

Plaintiff Scott J. Head applied for Social Security disability-insurance benefits and

supplemental-security-income disability benefits, in May 2013, based on a disability that he

alleged began in March 2012. The defendant Commissioner of Social Security denied his

applications and Mr. Head brought this suit for judicial review of those denials. The assigned

district judge referred this Cause to the undersigned magistrate judge for issuance of a report and

recommendation regarding the appropriate disposition of this matter. *Entry Referring Matter to*

*Magistrate Judge* [Dkt No. 16].

**Standards**

Judicial review of the Commissioner's factual findings is deferential: courts must affirm

if her findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Skarbek*

*v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.

2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the

evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient

1

for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505, 404.1566, 416.905, 416.966. The combined effect of all of an applicant's impairments shall be

considered throughout the disability determination process. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1523, 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further. At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the applicant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling. 20 C.F.R. §§ 404.1525, 416.925. If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy, together with any additional non-exertional restrictions. At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy. 42 U.S.C. §§ 404.1520, 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, Part A (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level. Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration. 20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision. If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

## **Background**

In 2002, while he was riding a bicycle, Mr. Head was struck by a pick-up truck and sustained a brain injury. He was hospitalized for approximately one and one-half years.

At step one, the ALJ found that Mr. Head had not engaged in substantial gainful activity since his alleged onset date in March 2012. At step two, he found that Mr. Head has the severe impairments of neurocognitive disorder due to traumatic brain injury, adjustment disorder with depressed mood, attention deficit disorder, and degenerative joint disease status post multiple injuries sustained in the 2002 accident. At step three, the ALJ found that Mr. Head's impairments, singly and in combination, severe and non-severe, did not meet or medically equal any of the conditions in the Listing of Impairments. The ALJ explicitly evaluated Listings 1.02A (major dysfunction of a joint(s), due to any cause, in a peripheral weight-bearing joint), 1.02B (same, in one major peripheral joint in both upper extremities), 12.02 (organic mental disorders), and 12.04 (affective disorders).

For steps four and five, the ALJ determined Mr. Head's RFC. He found that Mr. Head has the capacity to perform sedentary work except for certain exertional and non-exertional restrictions. The non-exertional restrictions are: (1) can understand and remember simple instructions; (2) can carry out simple, routine tasks; (3) can perform tasks at an average

production rate, but not at a stringent speed or strict production rate; (4) tasks learned by demonstration; (5) work in a stable work setting with little change in tools, processes, or setting, and necessary changes introduced gradually; (6) cannot perform tasks requiring intensely focused "concentration/attention;" and (7) can perform tasks that allow a brief break and a brief conversation with co-workers.

At step four, the ALJ found that this RFC prevents performance of Mr. Head's past relevant work. At step five, relying on the testimony of a vocational expert, the ALJ found that a significant number of jobs exist in the national economy that Mr. Head can perform with his RFC, age (40 years), and education (at least high school and able to communicate in English). Therefore, the ALJ found that Mr. Head is not disabled.

The Commissioner's Appeals Council denied Mr. Head's request to review the ALJ's decision, which rendered that decision the Commissioner's final decision on his claims and the one that the Court reviews.

<u>**Analysis**</u>

Mr. Head argues several errors in the ALJ's decision.

**1. Step-three determination.**

**a. Ms. Westfall's opinions.** Mr. Head first argues that the ALJ erred by failing to mention evidence from Ms. Westfall, Mr. Head's speech-language therapist. Mr. Head had 44 outpatient therapy sessions with Ms. Westfall from September 2013 to August 2014. She completed a "Cognitive Assessment Addendum" form upon Mr. Head's admission to therapy, [Dkt. No. 7, at ECF p. 376], and a progress assessment when he was discharged, [Dkt. No. 7, at ECF pp. 490-89]. On the admission form, Ms. Westfall rated Mr. Head as "profoundly impaired"

(the most severe level, a 1 on a 5-point scale) or "maximally impaired" (a 4) in the areas of attention, memory, insight, and executive function. She rated him as "moderately impaired" in problem solving/reasoning and in safety awareness (a 3) and as "occasional difficulty" (a 1) in the area of "orientation." In her discharge summary, Ms. Westfall wrote that Mr. Head "has difficulty taking in information and difficulty expressing information;" his employability is limited; and he requires a job that is repetitive, has little change, and includes extensive training, written instructions, and extra time. She rated Mr. Head as not meeting the long-term goals in the following areas: improving memory to a level adequate for home, work, and parenting needs; problem solving to the same level; organization to the same level; reading to the same level; and auditory comprehension adequate for work needs.

Mr. Head argues that the ALJ was required to address Ms. Westfall's opinions because they contradicted his finding that Mr. Head's examinations did not demonstrate "severe/marked deficits in memory or concentration/attention since 2012," and because her opinions were consistent with the opinions of Jeffrey W. Gray, Ph.D., and Edmund Haskins, Ph.D., psychologists who performed consulting examinations of Mr. Head. *Plaintiff's Brief in Support of Complaint* [Dkt. 9, at ECF p. 6] ("*Plaintiff's Brief*"). Mr. Head also contends that Ms. Westfall's opinions show that he has at least "marked" difficulties in the two functional categories of maintaining social functioning and maintaining concentration, persistence, or pace, which would satisfy the Paragraph B severity criteria of Listing 12.02.

The Commissioner first responds that Ms. Westfall is not an acceptable medical source. However, she was certified as a speech-language pathologist by the American Speech-Language-Hearing Association, which qualifies her as an acceptable medical source "for purposes of

establishing speech or language impairments only." 20 C.F.R. § 404.1513(a)(5). Mr. Head stated that "[i]t is clear from her evaluation [Ms. Westfall] was giving and [*sic*] opinion regarding Head's ability to communicate," *Plaintiff's Brief* [Dkt. No. 15, at ECF p. 2], but she identified only two qualifying speech/language opinions from her discharge summary: Mr. Head "has difficulty taking in information and difficulty expressing information," [Dkt. No. 7, at ECF p. 490], and he had not achieved the goal of improving auditory comprehension to a level adequate for work needs, [Dkt. No. 7, at ECF p. 492]. *Plaintiff's Brief* [Dkt. No. 15, at ECF p. 3]. It is clear that most of Ms. Westfall's opinions that are cited and relied upon by Mr. Head address issues such as memory, reading, problem solving, organization, repetitive work, slow processing, attention, alertness, and reasoning, rather than the establishment of a speech or language impairment. It is not apparent that any of these opinions are related to a speech and/or language impairment and neither Ms. Westfall nor Mr. Head explained any such relationship.

Limiting consideration to the two identified speech/language opinions by Ms. Westfall, Mr. Head does not explain how these difficulties support his Listings argument that he has at least "marked" difficulties in the functional categories of maintaining social functioning and maintaining concentration, persistence, or pace, such that Paragraph B of Listing 12.02 would be satisfied. In short, Mr. Head fails to show how these two opinions by Ms. Westfall demonstrate that Listing 12.02 is satisfied.

In addition, even granting that these opinions of Ms. Westfall are contrary to the ALJ's finding of less-than-marked difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, Mr. Head has not shown why Ms. Westfall's opinions required specific address by the ALJ or why the failure to address the opinions is not harmless

error. An ALJ is not required to discuss every piece of information in the record that is inconsistent with the rest of the record evidence or his findings and conclusions. *Murphy v. Colvin*, 759 F.3d 811, 817-18 (7th Cir. 2014) (although an ALJ may not dismiss a line of evidence that is contrary to his findings, he need not articulate a complete evaluation of every piece of evidence); *Pepper v. Colvin*, 712 F.3d 351, 362-63 (7th Cir. 2013). Mr. Head has not shown that Ms. Westfall's opinions are unique in the record. To the contrary, the ALJ discussed the findings and opinions of medical experts that were consistent with Ms. Westfall's evidence and that were inconsistent with it. Because Ms. Westfall's opinions — in her capacity as an acceptable medical source and as a non-acceptable medical source — do not represent a discrete line of evidence that was inconsistent with the remainder of the medical evidence or contrary to the ALJ's findings, the ALJ was not required to specifically address it.

Moreover, Mr. Head has not shown that, if his claims were remanded to the Commissioner for specific articulation by the ALJ of his evaluation of Ms. Westfall's admission and discharge forms, a different disability decision would result. There is no apparent reason to expect that the ALJ would give more weight to Ms. Westfall's early non-speech/language opinions than to the more recent findings and opinions of acceptable medical sources in the record. There is little reason to expect that the ALJ would give greater weight to the two acceptable medical source opinions by Ms. Westfall over the more recent, detailed, explained, and supported opinions by the other acceptable medical sources which the ALJ discussed and on which he relied.

The Court is not convinced that there would be a different result if the ALJ were required to articulate his evaluation of Ms. Westfall's medical-source and non-medical-source opinions.

**b. Dr. Haskins's findings.** Mr. Head next argues that the ALJ erred by failing to mention Dr. Haskins's findings on pages 5 and 6 of his February 23, 2015, "Resource Facilitation Neurovocational Evaluation – Final Report," [Dkt. No. 7, at ECF pp. 522-23], which findings Mr. Head contends are contrary to the ALJ's findings but consistent with those of Dr. Gray and Ms. Westfall, *Plaintiff's Brief* [Dkt. No. 9, at ECF pp. 6-7]. However, contrary to Mr. Head's assertion, the ALJ specifically discussed and evaluated Dr. Haskins' 2015 report. [Dkt. No. 7, at ECF pp. 30, 31, 33.] That the discussion appears in the RFC section of the ALJ's decision, not in the step-three section, is not erroneous. *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015).

**c. IQ scores.** Mr. Head argues that the ALJ erred by failing to discuss evidence that his intellectual functioning, as shown by his IQ scores, significantly declined from his pre-accident levels, dropping at least 15 IQ points and, thus, satisfying the criteria of Listing 12.02A7, which requires "[d]emonstration of . . . the medically documented persistence of . . . [l]oss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuro-psychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc. . . . ."

Mr. Head cites IQ test results from 2013 (Dr. Gray) and 2015 (Dr. Halstead). Mr. Head cites no test results in the record from before his accident for comparison. Instead, he cites only Dr. Gray's 2015 estimate that he must have had "approximately average to above average premorbid general intellectual abilities," [Dkt. No. 7, at ECF p. 532], which Mr. Head himself construed as "likely in the 106-115 range," *Plaintiff's Brief* [Dkt. 9, at ECF p. 8]. However, in his discussion of Mr. Head's 2013 IQ test results, which showed a full-scale score of 92, a verbal score of 95, and a non-verbal score of 105, Dr. Gray wrote that, "[b]ased on a demographic

estimate, taken in conjunction with the patient's history, the patient's estimated premorbid general intellectual abilities would be expected to be in a similar, but perhaps slightly higher range particularly in the verbal domain." [Dkt. No. 7, at ECF p. 382.] Dr. Gray further wrote that "[Mr. Head] certainly has demonstrated some improvement intellectually from when he was examined neuropsychologically in 2003" (scores of 83 full-scale, 79 verbal, and 90 non-verbal) and "[h]e definitely has shown some significant improvement along these lines." *Id.* Mr. Head's 2015 scores, tested by Dr. Haskins, were 89 full-scale, 95 verbal, and 92 non-verbal, [Dkt. No. 7, at ECF p. 520], which Dr. Gray found to be "fairly similar" to the 2013 scores, [Dkt. No. 7, at ECF p. 530].

As noted, Listing 12.02A7 requires a "[l]oss of *measured* intellectual ability of at least 15 I.Q. points from premorbid levels" (emphasis added). Because the record does not contain any measured premorbid IQ for Mr. Head (at least none that was cited to the Court), the evidence that Mr. Head argues the ALJ failed to address cannot prove satisfaction of Listing 12.02A7. Moreover, the only expert estimate of Mr. Head's premorbid IQ in the record (Dr. Gray's) is that it was similar to or "slightly" higher than his 2013 scores. Mr. Head's own non-expert estimate of his premorbid levels is not qualified evidence.

The ALJ did not err by not addressing the IQ evidence in relation to Listing 12.02A7.

**d. Activities of daily living.** Mr. Head argues that the ALJ erred by "inflating Head's activities of daily living, social functioning, and concentration, persistence, and pace" and by "fail[ing] to acknowledge" the difference between the capacity to perform activities of daily living, with the possibilities of flexible scheduling, lack of time demands, and assistance, and performing the demands of a full-time job. He contends that the ALJ also ignored evidence

regarding his activities and limitations that proved that his limitations were substantially worse than the ALJ found.

The ALJ discussed Mr. Head's activities of daily living, [Dkt. No. 7, at ECF pp. 25, 28, 32, 33], and his alleged symptoms and functional limitations, [Dkt. No. 7, at ECF pp. 27-28, 31]. The ALJ was not required to specifically address every one of Mr. Head's statements, *Carlson v. Shalala*, 999 F.2d 180 (7th Cir. 1993), but he was required to adequately explain the bases for his findings, and the Court can discern those bases. But, fundamentally, the ALJ did not find that Mr. Head was capable of working a full-time job based on his activities of daily living; rather, he made only a credibility determination that Mr. Head's activities of daily living were inconsistent with the degree of symptoms and functional limitations that he alleged. [Dkt. No. 7, at ECF pp. 25, 28-29, 31, 32.] Mr. Head has not shown error.

**e. Work history.** Mr. Head argues that the ALJ erred when he mistook the reason that his last two jobs ended and when he failed to consider the increased time that it took him, after his accident, to complete work tasks. The ALJ cited Mr. Head's ability to return to his previous work as a design engineer for several years after his accident as evidence that his allegations of significant difficulties with memory, concentration, and understanding were not credible, [Dkt. No. 7, at ECF p. 25], and that his alleged mental impairments are not as severe as he alleged, [Dkt. No. 7, at ECF p. 31].

The ALJ noted Mr. Head's testimony that his last two jobs — contract jobs as an engineer/designer and project engineer, in 2011 and 2012 — ended when the clients "cut short" the contracts. [Dkt. No. 7, at ECF pp. 27, 50-1.] The ALJ also noted Mr. Head's testimony that, when he returned to work after his accident, it took him much longer, sometimes three times as

long, to complete tasks and that he had to work ten or twelve hours a day to get his work done, [Dkt. No. 7, at ECF pp. 28, 63-4]. The ALJ's description of Mr. Head's testimony is accurate. What Mr. Head actually objects to is the ALJ's decision not to fully credit his statements and the ALJ's citation of Mr. Head's post-accident work as inconsistent with his alleged degree of symptom severity and functional limitation. The ALJ accurately described the reason that Mr. Head gave for the termination of his last two contract jobs and, by specifically reciting his testimony that it took him longer to complete tasks on his post-accident jobs, the ALJ did not fail to consider the testimony. The ALJ explained his reasons for not fully crediting Mr. Head's testimony regarding the severity of his symptoms and functional limitations, based on, for example, his daily activities, the objective medical evidence, and expert medical opinions, but the ALJ did not mischaracterize that testimony. Mr. Head has not shown error.

**2. Step-five determination.**

   **a. Treatment history.** Among the reasons that the ALJ found that Mr. Head's "extreme allegations" about his symptoms and limitations were not credible was that his treatment history was inconsistent with those allegations. [Dkt. No. 7, at ECF p. 31.] He found that Mr. Head had not sought treatment or medication for his physical problems for the past three years and had not sought psychiatric care or counseling, on a regular basis, for his depression. *Id.* Mr. Head argues that the ALJ erred in his RFC and step-five findings by incorrectly relying on his treatment history.

   The ALJ did not identify any expert medical evidence showing what treatments were medically indicated (and would have restored the ability to work) if Mr. Head's symptoms and limitations were as severe as he alleged. In addition, the ALJ failed to explore whether any such

treatments were available, financially and otherwise, and whether there were any reasonable reasons not to pursue them. In short, the ALJ cited no medical evidence in the record to support his assumption that Mr. Head's lack of treatments were inconsistent with his allegations.

The Commissioner argues that it is Mr. Head's burden to show that the ALJ's error was harmful and that he has failed to do so. Regarding the question whether any treatments that might have been indicated were financially available to him, Mr. Head cites record notations of medical providers seeking approvals for labwork and arrangements for payment plans that he contends "supported a conclusion" that he had neither insurance nor money for tests or treatments. In addition, he argues that, after ten years of treatments, he "may have believed" that further treatments would not be helpful. He also points to the fact that the ALJ made no inquiries about affordability or objections. This is a sufficient showing of harm from the ALJ's error. In addition, the lack of any medical evidence in the record supporting the existence of indicated treatments if Mr. Head's symptom and functional allegations were accurate supports a finding of harm resulting from the ALJ's error.

The ALJ improperly relied on a lack of expected treatments, for which he had no medical foundation, to support his credibility determination.

**b. Ignoring evidence contrary to credibility determination.** Mr. Head reiterates his step-three argument that the ALJ ignored significant contrary medical and other evidence which led to an improper assessment of his credibility. His arguments were addressed above and no error is shown.

**c. Work difficulties.** Mr. Head argues that the ALJ erred by ignoring significant contrary evidence when he relied on his post-accident work to discredit his credibility. However, Mr. Head fails to identify such ignored evidence and has forfeited the argument.

**d. Activities of daily living.** Mr. Head argues that the ALJ committed reversible errors when he relied on a misreading of Mr. Head's daily activities to discredit his statements.

**(1) Needing reminders.** Regarding his difficulty in getting things done and needing reminders, Mr. Head argues that the ALJ ignored a specific colloquy during the hearing when he described these difficulties. *Plaintiff's Brief* [Dkt. No. 9, at ECF pp. 13-14]. However, the ALJ specifically noted Mr. Head's descriptions in the cited passage of his decision. [Dkt. No. 7, at ECF pp. 27-28.] The ALJ did not ignore his testimony on this point.

**(2) Taking college classes.** Regarding the ALJ's discrediting of Mr. Head's symptom and limitation statements because he was able to take "more simple college classes, such as math and English and only struggled when presented with more complex classes," Mr. Head argues that the ALJ ignored evidence that he received a grade of D in English; he was given more time for his classes, other than math; he repeated the first year of classes; he could not complete a machine-shop class the second year, although it was the only class that he took; and did not pass his first year. *Plaintiff's Brief* [Dkt. No. 9, at ECF pp. 14-15].

The ALJ's decision states only that Mr. Head was capable of attending "some more simple college classes, such as math and English; succeeded in math and English; and struggled only with more complex classes. [Dkt. No. 7, at ECF pp. 25, 28.] Mr. Head's testimony about the extra time he was given to complete classwork, his failing grades, repeating courses, attending the same class twice in a day for better understanding, and inability to complete required projects

is substantially inconsistent with the ALJ's characterization that Mr. Head successfully attended simple college classes and struggled only with more complex classes. Mr. Head's testimony is uncontradicted by the supporting evidence cited by the ALJ and by any evidence cited to or found by the Court. Thus, this reason given by the ALJ for finding Mr. Head not entirely credible is unsupported by substantial evidence and was erroneous. The Commissioner has not shown that the error was harmless.

**(3) Cooking.** The ALJ cited Mr. Head's cooking three times a week as one of his daily activities that demonstrates a greater degree of functional ability than alleged. Mr. Head's only argument is citing his statement that he tries to make his and his son's meals as easy as possible. Because he fails to develop any argument of error, it is forfeited.

**(4) Child care, lawn mowing, driving, using a computer, using a smart phone, work at a church.** The ALJ found these activities of daily living to be inconsistent with Mr. Head's allegations because he ignored the parts of Mr. Head' testimony and other statements wherein Mr. Head describes the difficulties that he had when performing them.

An ALJ need only minimally articulate his reasoning, *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012), and need not address every piece of evidence, *Carlson v. Shalala*, 999 F.2d 180 (7th Cir. 1993). The ALJ's notation of Mr. Head's descriptions of his activities demonstrates that he was aware of and considered those descriptions. The ALJ also explained his reasons for not fully crediting those descriptions, citing contrary and inconsistent objective medical evidence, medical opinions, and other evidence. The ALJ also observed Mr. Head, in person, during his testimony. Merely quoting excepts of Mr. Head's testimony that Mr. Head contends are contrary

to the ALJ's credibility finding does not show that the ALJ ignored the statements or that his evaluation and findings are not supported by substantial evidence.

Mr. Head has not shown error.

**(5) Weighing medical opinions.** Mr. Head argues that the ALJ erroneously weighed the opinions of Drs. Gray and Haskins, to which he gave limited weight, and the opinions of Drs. Huett and Kladder, to which he gave great weight. He argues that the ALJ failed to consider a host of factors that should have been weighed in favor of Drs. Gray's and Haskins' opinions (*e.g.*, both were neuropsychologists, both had evaluated Mr. Head, Dr. Gray administered the Halstead-Reitan Neuropsychological Battery, and Dr. Haskins administered several tests) and that, in fact, their opinions should have been given controlling weight.

The ALJ's decision contains specific reference to the factors identified by Mr. Head, thus demonstrating that the ALJ did not ignore them.  In addition, only medical opinions by treating physicians are entitled to controlling weight, not opinions by non-treating examining physicians, which Drs. Gray and Haskins are. 20 C.F.R. § 404.1527. Finally, the ALJ gave reasons for assessing greater weight to the opinions of Drs. Kladder and Huett and Mr. Head did not present an argument why those reasons are not supported by substantial evidence.

Mr. Head did not show that the ALJ erred when weighing the medical opinions.

**(6) Concentration, persistence, or pace.** Mr. Head states that, after finding that he has moderate difficulties with concentration, persistence, or pace, the ALJ failed to ask the vocational expert about these difficulties, in violation of the rule of *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016), and *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618-21 (7th Cir. 2010). Mr. Head's argument consists of one sentence and is undeveloped. *Plaintiff's Brief*

[Dkt. No. 9, at ECF p. 20.] As such, any argument is forfeited. In addition, in his first hypothetical, the ALJ presented a set of limitations that were related to concentration, persistence, or pace, for example, limitation to an average production rate pace, no strict rate-based production requirements; simple one- to two-step tasks; and no tasks requiring intensely focused concentration or attention. [Dkt. No. 7, at ECF pp. 93-94.] Mr. Head did not argue, originally or in his reply, that these limitations did not accurately account for his concentration, persistence, or pace difficulties, or did not accurately incorporate expert medical translations of his concentration, persistence, or pace difficulties into functional limits.

Mr. Head has not shown error.

**(7) Expert opinions and later evidence.** Mr. Head argues that the ALJ's reliance on the opinions of Dr. Huett, consulting examining psychologist, and Dr. Kladder, reviewing state-agency psychologist, was unreasonable because the reviews and examinations were performed before several items of evidence entered the record, including Ms. Westfall's reports, Dr. Haskin's 2015 report, and Dr. Gray's 2015 report. Mr. Head's argument ends there. The Commissioner responds that the fact that evidence, including the doctors' reports, entered the evidence after Drs. Huett's and Kladder's opinions were rendered is immaterial because the ALJ himself considered the later evidence thoroughly and gave good reasons for giving greater weight to the opinions of Drs. Huett and Kladder.

The ALJ gave "very great weight" to the opinions of Drs. Huett and Kladder, [Dkt. No. 7, at ECF p. 33], and only "very limited weight" to those of Drs. Gray and Haskins, *id*. The ALJ discounted the opinions of Drs. Gray and Haskins because (1) they were inconsistent with objective medical evidence of record showing (a) that Mr. Head is very pleasant and cooperative

with normal thought process and content (factors relating to social functioning), (b) degrees of memory and concentration deficits that ranged from none to mild to sometimes moderate, but never severe or marked, and (c) Mr. Head's IQ test scores showing at least low average intellectual functioning; (2) they are inconsistent with Mr. Head's robust daily activities; and (3) they are inconsistent with other medical opinions that are more consistent with the record as a whole. [Dkt. No. 7, at ECF p. 33.]

While Dr. Kladder's opinion was based on his review of the record at that time, [Dkt. No. 7, at ECF p. 118-129], Dr. Huett's report shows that her opinion was not based on any review of the evidence of record, [Dkt. No. 7, at ECF p. 364 (opinions based on Mr. Head's report of his history, her current mental-status interview, and her clinical opinion)]. Thus, Dr. Huett's opinion stands on its own merits. However, the weight of Dr. Kladder's opinion depends on the quality and importance of the evidence that he reviewed. Both Dr. Haskin and Dr. Gray performed neuropsychological evaluations of Mr. Head, including the administration of mental-status and IQ tests, two years after Dr. Kladder's record review was conducted and only a few months before the ALJ's decision was issued. Although the Commissioner argues that the ALJ evaluated Drs. Haskins' and Gray's test results and opinions, he was not qualified to do so. Having been generated two years after Dr. Kladder's review, it would have been better for the ALJ to have solicited a supplemental opinion from Dr. Kladder, or another state-agency reviewer on the new test results and expert opinions.

The ALJ erred by relying on Dr. Kladder's stale review of the record evidence and the Commissioner has not shown that the error was harmless. The reports and opinions of Drs. Gray

and Haskins are significant enough that the Court finds that they might have changed Dr. Kladder's opinion and, thus, the ALJ's decision.

## Conclusion

The Commissioner's denial of Mr. Head's claims for benefits should be reversed and the claims remanded for reconsideration. The Commissioner should follow these instructions on remand:

1. If the ALJ again finds that Mr. Head's treatment history is inconsistent with the alleged severity of his symptoms and functional limitations, then the ALJ must identify the treatments that would be medically expected if Mr. Head's symptoms and limitations were as severe as alleged, he must have expert medical evidence supporting that identification, and he must inquire into and evaluate any reasons why Mr. Head did not or could not pursue such treatments.

2. If the ALJ again relies on Mr. Head's college classes as an indication of the credibility of his symptom and limitation allegations, then he must consider and articulate his evaluation of Mr. Head's statements about the difficulties that he experienced while performing the college work classes and the effect, if any, of accommodations that he received.

3. The ALJ may not assign significant weight to Dr. Kladder's medical opinion based on his review of the record without obtaining a supplemental medical opinion on the later submitted evidence, particularly the reports of Drs. Haskins and Gray.

If the ALJ does not again rely on any of the above matters, then he must reconsider his disability decision in their absence and minimally articulate his findings and rationale.

**Notice regarding objections**

Within fourteen days after being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2). A district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3). Failure to file an objection might result in forfeiture of the right to *de novo* determination by a district judge and to review by the court of appeals of any portion of the recommendation to which an objection was not filed. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010); *Schur v. L. A. Weight Loss Centers, Inc.*, 577 F.3d 752, 761 n. 7 (7th Cir. 2009); *Kruger v. Apfel*, 214 F.3d 784, 787 (7th Cir. 2000); *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

**SO ORDERED.**

Dated: 12/19/2017

Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.